**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

SHAWN AND MICHELLE
JORDAN, INDIVIDUALLY AND
ON BEHALF OF THEIR MINOR
DAUGHTER I.J.
925 GLENVIEW DR.
HURON, OH 44839

             PLAINTIFFS,

    VS.

HURON CITY SCHOOL
DISTRICT
712 CLEVELAND ROAD EAST
HURON, OH 44839

and

HURON CITY SCHOOL
DISTRICT BOARD OF
EDUCATION, PAUL WARD,
JODY MAST, DONNA GREEN,
JOHN P. JONES, AND SCOTT
SLOCUM, IN THEIR OFFICIAL
AND INDIVIDUAL CAPACITY
AS BOARD MEMBERS
712 CLEVELAND ROAD EAST
HURON, OH 44839

and

DENNIS MURATORI,
INDIVIDUALLY, AND IN HIS
OFFICIAL CAPACITY AS
SUPERINTENDENT OF HURON

CASE NO.

JUDGE

**COMPLAINT**

**(Jury Demand Endorsed Hereon)**

CITY SCHOOLS,
423 GATEWAY BLVD
HURON, OH 44839

and

CHAD CARTER,
INDIVIDUALLY, AND IN HIS
OFFICIAL CAPACITY AS
PRINCIPAL OF MCCORMICK
JUNIOR HIGH SCHOOL,
923 GLENVIEW DR.
HURON, OH 44839

and

MATT JACOBS,
INDIVIDUALLY, AND IN HIS
OFFICIAL CAPACITY
AS AN EMPLOYEE OF
MCCORMICK JUNIOR HIGH
SCHOOL,
339 BRUNSWICK DR.
HURON, OH 44839

          DEFENDANTS.

## **INTRODUCTION**

1.     This case arises out of the abject failure of the Huron City School District and its

    leaders to protect its young female students in favor of their male counterparts who

    have committed sexual offenses against their fellow students, but are shielded from

    consequence due to their status as a Huron football player and wrestler.

2.     Specifically, the Plaintiffs bring these claims against the Defendants for their

    contribution to the sexual harassment suffered by their Junior High School age

1

daughter who was victimized through gross sexual imposition, exposure of the student's genitalia during school hours and class time, the sending of unwanted lewd photographs, and constant harassment through lewd comments and physically pestered through throwing of pencils and purposefully harassing activities.  The Defendants knew about each of these incidents and the continuous nature of the harassment and did nothing to prevent the continued misconduct.  Instead, the Defendants went out of their way to protect and shield the young harasser from little, if any, consequence, so that he could continue his athletic career at the school and  in so doing, failed to provide a safe environment for the Plaintiff's daughter to be educated.

3.      Now comes the Plaintiffs, Shawn and Michelle Jordan, individually and on behalf of their daughter, Plaintiff I.J., a minor, and brings this action against Defendants Huron City School District Board of Education (the "District" or "HCSB"); Dennis Muratori, individually, and in his official capacity as Superintendent of Huron City Schools; Chad Carter, individually, and in his official capacity as Principal of McCormick Junior High School; and Matt Jacobs, in his individual capacity and as an employee of McCormick Junior High School.

4.      Plaintiffs do not need to exhaust administrative remedies prior to filing this Complaint. *Cannon v. University of Chicago*, 441 U.S. 677 (1979).

5.      No administrative remedies would redress the injuries I.J. suffered arising from John Doe's sexual harassment and battery of I.J., and the District's knowledge and failure to act promptly as the inaction forced I.J. to relocate her schooling.

6.      This is a civil action for compensatory and punitive damages for intentional

        infliction of emotional distress and negligence for violations of Title IX of the

        Education Amendments of 1972, 20 U.S.C. § 1681 and Ohio R.C. 2151.421.

7.      Plaintiffs also seek injunctive relief and the implementation of training of individuals

        employed by Defendant District's so these occurrences do not happen again.

8.      This action is brought to redress the injuries suffered by I.J. arising from John Doe's

        sexual harassment and battery of I.J., and the District's knowledge of and failure to

        act promptly.

### JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §

        1331, which gives district courts jurisdiction over all civil actions arising under the

        Constitution, laws, and treaties of the United States.

10.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1343, which

        gives district courts original jurisdiction over (a) any civil actions authorized by law

        to be brought by any person to redress deprivation, under color of any State Law,

        statute, ordinance, regulation, custom, or usage of any right, privilege, or immunity

        secured by the Constitution of the United States or by any Act of Congress providing

        for equal rights of citizens or of all persons within the jurisdiction of the United

        States; and (b) any civil action to recover damages or to secure equitable relief under

        any Act of Congress providing for the protection of civil rights.

11.     Plaintiff brings this action to redress a **hostile educational environment** pursuant to

        Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a) as more fully

3

set forth herein.

12.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), since all Defendants reside in this district and the events giving rise to the claims occurred in this district.

## **PARTIES**

13.     Plaintiffs Shawn and Michelle Jordan (hereinafter referred to collectively as "The Jordans" and "Mr. Jordan" and "Mrs. Jordan" respectively) are the parents and natural guardians of I.J., and reside with I.J. in the Huron City School District in Erie County, Ohio.

14.     I.J. is a minor age fifteen who was at all times relevant to this Complaint, a student at McCormick Junior High School, the only junior high within the Huron City School District.

15.     The Defendant Huron City School District is a public educational institution located in Erie County, Ohio.

16.     At all material times, Defendants Paul Ward, Jody Mast, Donna Gree, John P. Jones, and Scott Slocum, in their official and individual capacity worked within Erie County, Ohio.

17.     At all material times, Defendants Paul Ward, Jody Mast, Donna Gree, John P. Jones, and Scott Slocum, in their official and individual capacity were members of the Huron City School District Board of Education.

18.     At all material times, Defendant Dennis Muratori, in his official and individual capacities, worked within Erie County, Ohio.

19.     During all material times, Defendant Dennis Muratori was an agent and/or employee

4

of Defendant Huron City School District, acting or failing to act within the scope, course, and authority of his employment and his employer.

20.    At all material times, Defendant Chad Carter, in his official and individual capacities, worked within Erie County, Ohio.

21.    During all material times, Defendant Chad Carter was an agent and/or employee of Defendant Huron City School District, acting or failing to act within the scope, course, and authority of his employment and his employer.

22.    At all material times, Defendant Matt Jacobs, individually and in his official capacity as an employee of the school and individual capacity, worked within Erie County, Ohio.

23.    During all material times, Defendant Matt Jacobs was an agent and/or employee of Defendant Huron City School District, acting or failing to act within the scope, course, and authority of his employment and his employer.

24.    Hereinafter the above named Defendants will be referred to collectively as Defendants.

## FACTUAL ALLEGATIONS

25.    On approximately March 13, 2019, I.J. went to the McCormick Junior High School's gymnasium for the last period of the day.

26.    The physical education teacher asked I.J. to retrieve volleyballs from the locker room.

27.    When she went into the locker room, a male student, John Doe, was waiting for her.

28.    John Doe's home district for schooling is the Edison School District and he is

5

currently, and at all time relevant, openly enrolled in the Huron City School District.

29. I.J. asked John Doe what he was doing in the girl's locker room.

30. John Doe responded with "You don't get to ask questions."

31. John Doe then pushed I.J. against the lockers and put his hands down her pants in an attempt to touch her genitals.

32. John Doe was able to get his hands in between her pants and underwear before she kneed him and ran out of the locker room.

33. As is consistent with the conduct of a victim of sexual assault, I.J. was not able to inform her parents or any other person of this assault immediately following the assault.

34. Just weeks later, she was able to fully report the incident in detail to the school, her parents, and the police.

35. The school failed to protect her from further abuse and harassment.

36. During this same approximate time, I.J., as well as other students, were receiving lewd pictures and videos from John Doe of John Doe's genitalia.  This conduct was continued harassment that was perpetuating his gross sexual assault in the locker room.

37. John Doe sent pictures of his genitalia to I.J. on or about March 2nd through March 6th.

38. John Doe sent videos of himself ejaculating, telling I.J. he was thinking of her when he does this.

39. I.J. repeatedly told John Doe to leave her alone and to stop sending her the lewd

pictures and videos.

40.     Another family informed I.J.'s mother, Mrs. Jordan, what was happening.

41.     On approximately March 19, 2019, Mrs. Jordan contacted John Doe's mother.

42.     When she answered the phone, John Doe's mother asked, "What has he done now?"

43.     Mrs. Jordan set up a meeting with John Doe's mother and father at John Doe's home.

44.     John Doe's father put all the family portraits on the dining room table and told John

        Doe that he had disappointed all of them.

45.     John Doe admitted to sending the pictures and apologized to everyone, he then

        called the other students who he had sent lewd photos to who were not present at the

        meeting to apologize.

46.     On March 20, 2019 another family whose daughter (Jane Doe 1) was also receiving

        inappropriate pictures talked to Detective Matt Jacobs of the Huron Police

        Department about the pictures sent to the girls' phones by John Doe.

47.     Detective Jacobs, the investigating officer throughout the entire investigation, is also

        an employee of the Huron City School District and serves as the wrestling coach of

        John Doe at Huron High School.

48.     Detective/Coach Jacobs recommended that they should delete any pictures/videos

        John Doe sent their daughter and to inform the Jordans to either call him or delete

        the pictures/videos.

49.     Detectives/Coach Jacobs explained that both families could all be charged with child

        pornography if the pictures or items were discovered or reported before the families

        filed a report.

7

50.    I.J. came home from school very upset due to the fact that John Doe harassed her the entire day, saying, "You know you wanted these," referring to his lewd pictures and videos.

51.    Mrs. Jordan called Detective/Coach Matt Jacobs that evening and set up an appointment at the Huron Police Department for 8am the next morning.

52.    Mr. and Mrs. Jordan met with Detective/Coach Jacobs at the Huron Police Department on March 21, 2019.

53.    Mr. and Mrs. Jordan explained to Detective/Coach Jacobs everything that had happened with the inappropriate pictures and the meeting with John Doe's parents.

54.    Detective/Coach Jacobs indicated that he knew John Doe well and was not surprised that John Doe was committing these offensive acts.

55.    Detective/Coach Jacobs knew John Doe personally, since he was his wrestling coach at Huron City Schools.

56.    Detective/Coach Jacobs said that he told the wrestling team not to send these pictures, but he said they kept doing it because that is how kids "date" nowadays.

57.    Huron City Schools had knowledge that members of the wrestling team were sending young female students lewd pictures and when it was reported to the school and the police that the pictures were unwanted and part of bullying and harassing behavior, the Huron City Schools did nothing to prevent future misconduct and did nothing to keep I.J. safe from the bullying and sexual harassment.

58.    Mr. and Mrs. Jordan left I.J.'s phone with Detective/Coach Jacobs, so he could download the inappropriate pictures and videos with the intent that the evidence

8

would be used to prosecute John Doe for this illegal conduct toward their daughter.

59. The Jordans later learned from the Prosecutor that Detective/Coach Jacobs never sent the evidence of this illegal harassment to the Prosecutor's office.  Instead, Detective/Coach Jacobs, kept the evidence to himself and made false statements regarding the contents of I.J.'s phone to third parties in order to disparage I.J. and further shield John Doe from consequence.

60. On March 21, 2019, Mr. and Mrs. Jordan went to McCormick Junior High School to meet with Principal Chad Carter and Detective/Coach Jacob to sit in on I.J.'s interview regarding her report of being the victim of these lewd photos from John Doe.

61. I.J. detailed the multiple times that John Doe exposed himself in front of her and to her at school.

62. At this point, as of March 21, 2019, the principal of the Junior High and the Detective in charge who also is an employee of the school, are on unequivocal notice that they have a duty to protect I.J. from further harassment.

63. At this point, Detective/Coach Jacobs saw the photos of John Doe, sent by him to I.J. on I.J.'s phone.

64. John Doe has admitted that he in fact sent these photos.

65. Even in light of this notice, the School did nothing to separate John Doe from I.J., did nothing to return him to his home district, did almost nothing to provide a consequence to John Doe, and allowed John Doe unfettered access to I.J. which allowed for continued harassment.

66.  By failing to take action and to give consequence to John Doe, the school district promoted the harassment and bullying of the victim I.J.

67.  I.J. also told Principal Carter and Detective/Coach Jacobs that John Doe showed his phone to I.J. and another female student (Jane Doe 2) that had pictures of John Doe's penis on them.

68.  I.J. also stated that Jane Doe 2 told her that John Doe had been exposing himself to her during choir class at school the entire school year.

69.  John Doe also told I.J. and Jane Doe 2 that he took pictures up another female student's skirt.

70.  Mr. and Mrs. Jordan were told that the school would contact the parents of Jane Doe 2 to discuss the issue.

71.  Mrs. Jordan told them that Jane Doe 2's parents wanted to be called when they interviewed Jane Doe 2 because she had anxiety issues.

72.  They assured Mrs. Jordan that they would and never did.

73.  To this day, they have not called the parents of Jane Doe 2.

74.  I.J. left school for the day after her interview was completed.

75.  Detective/Coach Jacobs brought I.J.'s phone back the next day, March 22, 2019.

76.  Detective/Coach Jacobs stated that there was nothing on the phone incriminating I.J., and showed Mrs. Jordan how to check her phone in spots that kids like to hide pictures they do not want adults to see.

77.  Detective/Coach Jacobs said that he would expect the school to suspend him for ten days.

10

78.   This suspension did not occur, a shorter five day suspension was given. The school failed to provide sufficient consequence to ensure the safety of the victims.

79.   Had John Doe been given a ten day suspension (the standard and expected consequence)  he would not have been eligible to be accepted as an open enrolled student for the 2019/2020 school year.

80.   Mr. and Mrs. Jordan noted that the pictures and videos were deleted off of I.J.'s phone. Detective/Coach held the only proof of the illegal misconduct by John Doe.

81.   Detective/Coach Jacobs informed them he would make a report and submit it to the Erie County Prosecutor's office. He failed to send the evidence of the wrongdoing along with the report.

82.   Detective/Coach Jacobs informed the Jordans that he could not conduct an interview with John Doe since his family hired an attorney.

83.   The following week was spring break, and instead of being suspended, John Doe was in school when they returned Monday, April 1, 2019, sending a clear message to I.J. that she would not be offered a safe educational work environment.  In fact, John Doe was seated next to her in almost all of her classes and nothing was done to move him.

84.   Chad Carter told Mrs. Jordan that Detective/Coach Jacobs conducted an interview with John Doe over Spring Break; however, Mr. Carter was not invited.

85.   Later, John Doe received a mere five (5) day suspension (as referred to above).

86.   John Doe returned to school April 8, 2019, and immediately restarted his continuous and repeated harassment of I.J.

11

87.     Mr. Jordan called Superintendent Dennis Muratori on April 8, 2019.

88.     Mrs. Jordan communicated with Chad Carter about the harassment I.J. was facing,
        and Principal  Carter said, this is "just how kids are," that he did not want to contact
        John Doe's family, and that the Jordans' would not "win" on this.

89.     Mr. Jordan talked to Superintendent Muratori on April 9, 2019, and Mr. Muratori
        stated that there was nothing that could be done about John Doe because no one
        witnessed the harassment.

90.     This of course was untrue.  There is a significant number of witnesses to the
        continued harassment and there is corroborative evidence of the gross sexual
        imposition in the locker room.

91.     Further, John Doe admitted to most of the misconduct in front of five witnesses.

92.     Mr. and Mrs. Jordan instructed I.J. to go to the office and tell someone when John
        Doe is harassing her.

93.     On April 10, 2019, John Doe's seat was located immediately next to I.J.'s and he
        repeatedly threw pencils at I.J. and struck her head.

94.     Another student, John Doe 2, told John Doe to stop.

95.     I.J. went down to the office to inform the principal, and when Mr. Carter saw her he
        said, "God dammit."  This was a clear indication to I.J. that the Principal of the
        school was unhappy that this female student was standing up for herself in her
        attempts to free herself from the harassing behavior.

96.     He listened to what she had to say and then told her to go back to class.

97.     Mr. Carter called John Doe down to the office and John Doe said he did not do it.

12

98.     Mr. Carter told I.J. there was nothing he could do.

99.     The school did nothing to determine if any other children were eyewitnesses.

100.    The school failed to take action after McCormick Junior High School student, John Doe 2, stated in an interview that he had seen John Doe throwing the pencils at I.J. and told him to stop.

101.    The school failed to take action within the classroom to ensure that I.J. was safe and free of harassment.

102.    The school failed to inform the teachers that I.J. and John Doe should be separated to ensure that I.J. had a classroom environment that was suitable for her educational needs.

103.    In every class, I.J.'s seat was located next to John Doe, even after the pencil throwing and striking incident, the school did not move his or her seat.

104.    Because of the close proximity, John Doe was able to continue harassing I.J. during class time and before and after class as a direct and proximate result of the school's failure to take action to protect I.J. from the harassment and proximity of John Doe. For example, John Doe would repeatedly whisper into I.J.'s ear that she "liked it" and "wanted it" during class referring to the sexual harassment, imposition, lewd photographs and his unwanted exposures of his genetalia.

105.    Mr. Jordan called Mr. Muratori and Mr. Carter about these incidents and reported the repeated incidents in detail.

106.    I.J. repeatedly reported to the school the details of John Doe's conduct toward her and specifically conveyed to Mr. Muratori and Mr. Carter the incidents.  She further

told Mr. Muratori and Mr. Carter (the school staff she was instructed to communicate with) that some of the most egregious conduct could been seen on the school's security cameras.

107. Principal Carter claimed he pulled camera footage and said he did not see anything to substantiate her claims, but he conveniently pulled footage from a different day and time.

108. Principal Carter and the school failed to take reasonable and necessary steps to review the correct footage and save that footage.

109. Instead, Principal Carter and the School District took steps to shield John Doe from consequences for his harassment of I.J. and failed to provide a safe and suitable education environment for her.

110. Superintendent Muratori admitted to Mr. Jordan that they had "dropped the ball" by not moving I.J.'s seat away from John Doe.

111. During the entire duration that I.J. continued in the Huron school system, John Doe continued to harass I.J. at school.

112. As a direct and proximate result of the school's failure to provide I.J. with a safe and suitable education environment,  I.J.'s grades slipped and Mr. and Mrs. Jordan had a difficult time making I.J. go to school.

113. On May 15, 2019, I.J. told her mother about the locker room assault.

114. On May 16, 2019, Mrs. Jordan called the Prosecutor's office and also informed Detective/Coach Jacobs.

115.   On May 21, 2019, the Jordans met with Prosecutor Cheryl Goodrum to discuss all details of the current charges and details of the locker room assault.

116.   Ms. Goodrum informed the Jordans that Detective/Coach Jacobs, (the coach of John Doe) never sent the pictures and videos from I.J.'s phone.

117.   Goodrum also tells the Jordans that John Doe just turned his phone in, but refused to give his Apple password. The High School wrestling coach did not take reasonable steps to investigate the evidence in John Doe's phone.  The actions interfered with I.J.'s ability to have a safe and suitable educational environment.

118.   On May 22, 2019, Detective/Coach Jacobs called Mr. and Mrs. Jordan and asked if they wanted to be present for the interview with Chad Carter and himself regarding the locker room assault.

119.    Mr. and Mrs. Jordan met them at the school at 10:15a.m. on May 22, 2019.

120.   I.J. was called down to the office for the meeting and became very distant, consistent with the diagnosis of PTSD,  upon finding the adults that were tasked with protecting her, but continuously failed to do so, assembled there for the meeting.

121.   I.J. detailed the incident for Prosecutor Cheryl Goodrum on May 21, 2019 in a one on one meeting.

122.   Prosecutor Cherly Goodrum conveyed to the Jordans that she believed I.J.'s story given the specific details I.J. was able to give.

123.   During the interview I.J. conveyed three days of intimidation of her by John Doe. These events included John Doe yelling over her head to individuals on the other side of her. When he was corrected by a teacher and told to stop, the next day he

15

altered his behavior so as to not break the rules. Finally, on the third day he began whispering in her ear that she "liked it" and "wanted it."

124. I.J. later informed her parents that the reason she was crying was because she felt Mr. Carter and Detective/Coach Jacobs did not give her any support or help the last two months and felt this would make it worse.

125. This lack of support is reflected by their failure to present these facts to the Board despite other students conveying they had seen John Doe's treatment of I.J.

126. I.J. asked that her father leave the room for the interview because she did not want to have him hear what happened.

127. I.J. went back to class and shortly after Detective/Coach Jacobs came down and retrieved John Doe from class to speak with him.

128.  On their way out, I.J. and Jane Doe 2 heard and watched Detective/Coach Jacobs pat John Doe's back and say "it's ok buddy....we got this."  The message was clearly sent to I.J., that the school, including the Detective/wrestling coach and the principal, would ensure that John Doe would be shielded from any significant consequence and that the victims of his conduct would be the ones to bear the burden.

129. There is nothing in the police report pertaining to any statements, interviews or investigative results from questioning John Doe in regard to exposing himself to I.J. in the gym.

130.    Detective/Coach Jacobs interviewed I.J.'s teacher Mr. Demos, John Doe's teacher Mr. Schoenherr and another student John Doe 2 pertaining to the March 13, 2019 assault.

131.    Detective/Coach Jacobs asked John Doe's teacher (Mr. Schoenherr) if John Doe was ever out of the classroom for an extended period of time or ever left class. Schoenherr indicated that he did not leave the class.  However, John Doe was tardy that day to the class which is exactly when the incident occurred, and this fact is conspicuously absent from the Report.

132.    The incident happened at the beginning of the period, and Mr. Shoenherr knew that John Doe was tardy.

133.    When I.J. walked out of the locker room John Doe 2 asked her if she was okay and I.J. said "No, I don't feel good."

134.    Detective/Coach Jacobs' report stated that because it was the end of the day he was going to come back and question the students.

135.    Mr. Jordan talked to Detective/Coach Jacobs regarding the incident.

136.    Detective/Coach Jacobs indicated to Mr. Jordan that upon questioning John Doe, John Doe excused his behavior of exposing himself to I.J. by blaming another student claiming he was "de-pantsed".

137.    At no time did John Doe claim that I.J. was not exposed to his genitalia during the school day.

138.    Even under John Doe's version of the facts, I.J. was exposed to the genitalia during the school day of an individual who was continuously harassing her.

17

139.     The School did nothing to ensure that I.J. had the freedom and space to be educated in an environment that is free of harassment.

140.     In fact, John Doe continued to sit directly next to I.J. in class throughout this period.

141.     No punishment or consequence was administered to John Doe, which bolstered his bullying and harassing behavior, when in fact the School should have been working to put a stop to it.

142.     John Doe continued to harass I.J. and would not leave her alone.

143.     On May 24, 2019, Mrs. Jordan called Mr. Carter and begged him to separate I.J. and John Doe's seats in class and handle the situation.

144.     John Doe was arrested May 27, 2019 on the charges associated with sending pictures of his genitalia to I.J. and other victims.

145.     The arraignment was conducted on May 28, 2019.

146.      John Doe was charged with two counts of pandering and two counts of public indecency.

147.     On June 10, 2019 John Doe pleaded guilty to one count of pandering.

148.     On June 10, 2019 the District accepted John Doe as an open enrolled student for the 2019/2020 school year.

149.     John Doe was released on house arrest with an ankle monitor.

150.     The terms of John Doe's house arrest were that he was only to leave home to attend mandatory school activities.

151.     That evening, June 10, 2019, the Jordans received a phone call that he was at football practice.

152.    Prosecutor Goodrum confirmed to the Jordans that John Doe should not be at football practice according to the plea agreement.

153.    The Jordans found out that the entire football coaching staff was put on the adult supervision list of John Doe.

154.    The School skirted the probation rules of the Court by adding coaches to the supervision list in order to shield John Doe from any consequences, further bolstering his position to harass his victims.

155.    The Jordans contacted Mr. Muratori and were told that he was unable to discuss another student's discipline with them.

156.    At that time John Doe was in violation of his house arrest when he was allowed to attend football practice as practices are not considered mandatory school activities.

157.    While at football practice, John Doe told other students/teammates to "make life hell" for I.J. and the other victims.

158.    During an incident on July 11, 2019 other students, at the prompting of John Doe, screamed at I.J. calling her "John Doe's whore."

159.    The football coaches and Superintendent did nothing to stop the student athletes from harassing I.J.

160.    Mr. Jordan called the school board and was able to speak with Jodie Mast, Vice President of the Huron Board of Education.

161.    Ms. Mast was sympathetic and warned Mr. Muratori that he was "flirting with litigation." Still, nothing was done.  The School continued to support the activities of

John Doe and leave I.J. on her own to attempt to find an adequate place to be educated free of the harassment and bullying.

162. On July 16, 2019, the Huron City School Board held an executive meeting and adjusted mandatory football practices to begin immediately, and not the standard August 1st commencement date of mandatory practices, thus bending to the needs of John Doe in a demonstration of clear favoritism, despite the full knowledge of his harassing, bullying and criminal conduct toward multiple young female students including I.J.

163. The District claimed that they had no knowledge of the charges against John Doe, but the Board's Meeting Minutes throughout this period show comments made by board members that clearly indicate they were on notice.

164. The School Board designated football coaches as "Supervising Adults" over John Doe, thus proving they were on notice that John Doe had pled guilty to the criminal charges and required supervision.

165. The School Board's decision was a direct contradiction to the House Arrest and was made to shield the male football players and wrestlers at the expense of the safety and education of the female students in the school.

166. Superintendent Muratori told the Jordans it was not the school's job to enforce the house arrest, sending a clear message to I.J. that she would not be protected from sexual harassment, bullying and other harassment at school.

167. Superintendent Muratori told the Jordans that he could not talk about the state of the punishment against John Doe and must "remain neutral."

20

168.    As a direct and proximate result of the harassment and the environment created and promulgated by the District, I.J. continued to suffer, and on July 31, 2019 admitted to her mother that she had been harming herself.

169.    The next morning Mr. and Mrs. Jordan took I.J. to the family doctor, and she was later admitted into Fairview Hospital in Cleveland from August 1-5, 2019.

170.    I.J. was diagnosed with PTSD and major depressive disorder as a direct and proximate result of the harassment and the environment created and promulgated by the School.

171.    At Mr. and Mrs. Jordan's own expense, I.J. now attends a private school, so that their daughter is not subjected to continued harassment and abuse.

172.    The other victims have also chosen to attend other schools.

173.    Further, I.J. attempted suicide in February of 2020 along with Jane Doe 1 as a direct and proximate result of the harassment and the environment created and promulgated by the School.

## COUNT ONE:
## Defendant's Failed to Comply with the Requirements of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681

174.    Plaintiffs repeat and incorporate herein all previously pleaded averments.

175.    The Defendants subjected Plaintiff to a hostile educational environment in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a) ("Title IX"), because

        a.      Plaintiff, as a female, was a member of a protected class;

    b.        She was subjected to sexual harassment by another student during hours where Defendants had substantial control of the students and the environment;

    c.        She was subjected to harassment based on her sex; and

    d.        She was subjected to a hostile educational environment created by the School District's failure to properly investigate and/or address the sexual assault and harassment.

176.    The sex-based harassment articulated in Plaintiff's allegations above was so severe, pervasive, and objectively offensive that is deprived Plaintiff of access to educational opportunities or benefits provided by the school.

177.    The harassment I.J. suffered at the hand of John Doe was so severe that it effectively barred I.J.'s access to educational opportunities and benefits in violation of Title IX. Examples of the harassment include:

    a.        John Doe sending unsolicited pictures of his genitalia to I.J. and other classmates.

    b.        John Doe sending videos of himself ejaculating to I.J. while telling her he was thinking of her.

    c.        John Doe attempting to touch I.J.'s genitals by shoving his hands down her pants during I.J.'s gym period.

    d.        John Doe antagonizing I.J. by telling her things such as: "you know you wanted these" (in reference to the pictures of his penis he had sent to her), telling I.J. she "liked it" and "wanted it" during class, and telling the

McCormick Junior High School's Football Team to "make life hell" for I.J. after charges were filed against him regarding the sending of the pictures of his penis.

e.    John Doe exposing himself to I.J. multiple times.

f.    John Doe throwing pencils at I.J's head while seated next to her in class.

g.    John Doe repeatedly striking I.J's head while seated next to her in class.

178.    Defendants acted with willful, deliberate, and intentional indifference to the harassment that I.J. suffered at the hands of John Doe  by:

a.    Ignoring I.J.'s detailing of the multiple times John Doe had exposed himself to her.

b.    Making no investigation into I.J.'s claims that John Doe had shown her and another student images of his penis he had on his phone.

c.    Making no investigation into the claims that John Doe had taken pictures up a female classmate's skirt.

d.    Defendant Carter telling the Jordans "this is just how kids are," that he did not want contact with John Doe's family, and that the Jordans "would not win on this" when the Jordans approached him about the harassment I.J. was suffering.

e.    Taking no action to separate I.J. and John Doe's seats in class after being told by I.J. about the harassment she was facing, going as far as ignoring the begging of the Jordans to have the seats moved.

23

      f.      Failing to tell I.J. and John Doe's teachers about the complained of harassment.

      g.      Defendant Muratori admitting to the Jordans that the school had "dropped the ball" by failing to move I.J. or John Doe's seat. (4/9/19)

      i.      Defendant Muratori was going to talk to Chad Carter and move her seat in every class; the Jordans were told it happened, but I.J. said it never did.

      h.      Intentionally reviewing the incorrect location and time of the security camera's recordings and therefore failed to take appropriate efforts to substantiate I.J.'s claims.

      i.      Allowing John Doe to violate house arrest for a non-mandatory school events by designating football coaches as supervising adults, despite constructive notice that John Doe had pled guilty to the criminal charges he faced in his actions against I.J.

179.      Defendants breached their duty to provide an equal opportunity to education to I.J. in violation of Title IX by failing to take any immediate, effective remedial steps to investigate or mitigate the harm from the harassment I.J. was suffering because of John Doe's actions.

180.      Defendants' failure to promptly and appropriately respond to the alleged sexual assault and harassment, resulted in Plaintiff, on the basis of her sex, being excluded from the opportunities and benefits of an education in violation of Title IX.

181.      As a direct and proximate result of Defendants' breach, Plaintiff, I.J., has suffered emotional distress and psychological damage, and her character and standing in her

24

community have suffered from the harassment fostered as a direct and proximate result of Defendants' deliberate indifference to her rights under Title IX.

182.    As a direct and proximate result of Defendants' breach, Plaintiffs have suffered extensive and irreparable damages and are entitled to compensatory damages, punitive damages, costs, and attorney's fees in an amount to be determined by a jury, but well more than $25,000.

## COUNT TWO
## Failure to Supervise

183.    Plaintiffs repeat and incorporate herein all previously pleaded averments.

184.    As employees of the Huron City School District, Defendants had a duty to supervise all students that are members of the school district during the school day and while at events substantially controlled by the school.

185.    Defendants failed to supervise their employees and their students with respect to harassment, bullying and sexual harassment of I.J. Including but not limited to the following examples:

a.      On March 13, 2019 Defendants failed to supervise John Doe during the last period of the day and that failure allowed for John Doe to sneak into the school's gym and assault I.J.

b.      The Principal and Superintendent were fully aware of the conduct of John Doe with respect to I.J. And they did nothing to move John Doe away from I.J. During class.  The seats were directly next to each other and were not moved for two months.

c.     The Principal and Superintendent did nothing to remove the harassing party

from the school district when the harasser was open enrolled and the policy

of open enrollment should have resulted in the student being returned to his

home district.

d.     The Principal and Superintendent failed to supervise the teachers and coaches

of the school to ensure that the harasser was not given access to I.J. to

continue his harassment.

186.    In multiple incidents throughout the remainder of the school year, Defendants'

failure to supervise John Doe allowed him to harass I.J.

187.    Defendants' failures to supervise John Doe were the direct and proximate cause of

the attempted assault and harassment I.J. suffered from.

188.    As a direct and proximate cause of Defendants' negligence, Plaintiffs have been

irreparably damaged. Plaintiffs are entitled to compensatory damages, punitive

damages, costs, and attorney's fees in an amount to be determined by a jury, but well

more than $25,000.

## COUNT THREE
### Negligence

189.    Plaintiffs repeat and incorporate herein all previously pleaded averments.

190.    As officials in a school setting, Defendants had a duty to provide all students with

the same access to education. Included in this is the duty to protect students from the

known harassment of other students.

191.    Defendants breached this duty when they failed to investigate the claims of

harassment I.J. made against John Doe and failed to take any steps to mitigate or

prevent the harassment from continuing to occur, effectively barring her access to an equal opportunity for an education.

192.    Defendants failure to take the necessary steps are the direct and proximate cause of the continuing harassment of I.J. at the hands of John Doe.

193.    Plaintiffs suffered harms directly and proximately caused by Defendants breach. These harms include but are not limited to:

      a.      The continued harassment of I.J. by John Doe.

      b.      The taunting of I.J. by other students.

      c.      I.J.'s hospitalization at Fairview Hospital in Cleveland.

      d.      I.J.'s diagnosis with PTSD and major depressive disorder.

      e.      I.J.'s suicide attempt in February 2020.

      f.      Plaintiffs' relocation of I.J.'s schooling to a private school at Plaintiffs' expense.

194.    As a direct and proximate cause of Defendants' negligence, Plaintiffs have been irreparably damaged. Plaintiffs are entitled to compensatory damages, punitive damages, costs, and attorney's fees in an amount to be determined by a jury, but well more than $25,000.

**COUNT FOUR**
**Intentional Infliction of Emotional Distress**

195.    Plaintiffs repeat and incorporate herein all previously pleaded averments.

196.    Defendants failure to take any action to protect I.J. given Plaintiffs' repeated reporting of the harassment she was suffering at the hands of John Doe and their

knowledge of the criminal investigation being conducted against John Doe was reckless.

197.    Defendants' repeated failures were so outrageous they would cause emotional distress in any reasonable person.

198.    As a direct and proximate result of Defendants' failures to act I.J. suffered severe emotional distress as reflected by the time she spent at Fairview Hospital in Cleveland and her February 2020 suicide attempt.

199.    As a direct and proximate cause of Defendants' negligence, Plaintiffs have been irreparably damaged. Plaintiffs are entitled to compensatory damages, punitive damages, costs, and attorney's fees in an amount to be determined by a jury, but well more than $25,000.


**WHEREFORE,** Plaintiffs Shawn and Michelle Jordan, individually and on behalf of their minor daughter I.J., respectfully pray that judgment be entered in their favor in an amount to be determined by a jury but well more than $25,000. Plaintiffs further pray for an award of actual, compensatory, and punitive damages, for an award of costs and attorneys' fees as outlined here, as well as whatever additional legal and equitable relief the Court might find just under the circumstances.


Respectfully submitted,

*/s/Leslie O. Murray*_____
Leslie O. Murray (0081496)
Direct: (419) 677-6689
Leslie@lesliemurraylaw.com
*/s/John T. Murray*_____

28

John T. Murray (0008793)
Direct: (419) 656-2042
John@lesliemurraylaw.com
**LESLIE MURRAY LAW LLC**
316 E. Water St
Sandusky, OH 44870

## JURY DEMAND

Pursuant to Rule 38(B) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury on all issues.

*/s/ Leslie O. Murray*_____
Leslie O. Murray (0081496)
*/s/John T. Murray*_____
John T. Murray (0008793)

29